(No. 73277.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CARL EARL LAWSON, Appellant.

*Opinion filed December 1, 1994.*

Charles M. Schiedel, Deputy Defender, and Steven L. Clark, Assistant Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn Kaplan, Solicitor General, and Terence M. Madsen and Karen Alice Kloppe, Assistant Attorneys General, of Springfield, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Carl Earl Lawson, was indicted for the first degree murder of eight-year-old Terrance K. Jones by the grand jury of St. Clair County. Following a jury trial, defendant was found guilty and convicted of murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)). He subsequently waived jury sentencing and was sentenced to death based on several statutory aggravating factors (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(7)). Defendant's death sentence was stayed (134 Ill. 2d R. 609(a)), pending direct review by this court (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603). After careful review, we reverse and remand for retrial based on a finding of reversible trial error.

FACTUAL BACKGROUND

On July 28, 1989, between 7 and 8 a.m., the body of eight-year-old Terrance Jones (known as T.J.) was found lying face down approximately 15 or 16 feet inside a small, abandoned church located at 1825 Kansas Street in East St. Louis, Illinois. T.J.'s body was found, following a neighborhood search, after he was discovered missing from his nearby home, sometime after 11 p.m. on July 27, 1989.

The child had been stabbed several times in the back, chest, and arm, and his throat had been cut. He was clothed in a T-shirt with his underpants pulled down around the knee area and on only one leg. Forensic tests revealed no physical evidence of sexual assault, and no presence of seminal fluids. Although an autopsy was performed on the body, it was impossible for

medical examiners to determine the time of the child's death.

The interior of the small church was dusty, dirty and in a state of complete deterioration. Trash, old furniture and drywall substance from the collapsing ceiling and walls were present throughout. The exterior yard was littered with broken bottles and glass and overgrown with weeds. Although there were two entrances to the church, front and back, the back yard area was so choked with weeds that entrance by that route was difficult. The front yard was also overgrown, but there was a pathway leading into the church. In order to see the child's body, one had to walk beyond the threshold of the church's front doorway.

Prior to death, T.J. resided with Pam Burts, his mother, Lisa McDonald, his 14-year-old sister, and his 10-year-old brother in a home partitioned into several apartments, which belonged to defendant's extended family. Defendant, Alberta Lawson, his mother, and various other relatives lived in the home. In total, about 11 or 12 people lived in the Lawson home, which was located at 1817 Kansas Street, approximately 40 yards, or two houses west, of the abandoned church.

In the early part of the summer of 1989, Burts and defendant became romantically involved, but subsequently ended their relationship about two or three months prior to the murder. Testimony varied concerning whether defendant was not upset, upset, or very upset over the relationship's demise. Sometime after the relationship ended, defendant was observed standing on the roof of the Lawson home, in the company of his sister, Ella Gossett. Defendant had other girlfriends, however, after the relationship with Burts ended. Defendant also assisted Pam Burts as she searched for T.J., sometime after she returned from work at around 4 or 5 a.m. on July 28. He was heard to say then that T.J. was not his "damn" child.

During the morning hours following the discovery of T.J.'s body and before the arrival of the police at around noon, many people in the surrounding neighborhood entered the church and observed the body. Defendant was among those who entered the church before police arrived. According to several witnesses, defendant walked around the body and also removed Pam Burts from the church after she collapsed upon viewing the child's body. Defendant was also witnessed trying to prevent Burts from entering the church and viewing the body.

Milton Wilson, an individual unknown to people in the neighborhood, was also in the church following the discovery of the body. Wilson acted "crazy," as if he were on drugs, pointing out various drug paraphernalia located around the body, and speculating out loud that the killer was possibly then present in the church. Wilson was also pointing out various parts of his own body where he had been stabbed previously. Wilson's arms appeared to have been freshly scratched, and there was blood on them. Wilson showed a witness at the scene some crack cocaine. Wilson also pulled a covering blanket off the body after Burts entered the church.

When police arrived at around noon, they observed a crowd of people around the church and several adult males exiting. After securing the area, police recovered various items, some of which were located in the immediate proximity of the body (matchbook covers, cellophane cigarette wrappers, a piece of a page from a pornographic magazine, a small tube of metal, commonly known as a "straight-shooter" or a "crack" pipe), and on top of a nearby space heater (spoon, saucer, steel wool material, rag, cigarette butt). Police also recovered an empty Stag beer bottle, which was described by them as not being dirty, from a corner area of the church, about 10 feet from the body.

During the investigation, a police crime scene analyst observed several shoeprints in a substance which appeared to be dried blood. Subsequent forensic tests revealed the substance to be human blood consistent in type with the victim's. The bloody shoeprints were on two pieces of wooden paneling located immediately to one side of the body. The shoeprints bore the word "Pro-Wing," a brand of gym shoe indisputably worn by many individuals in the immediately surrounding neighborhood. Based on the fact that the blood was dried, the police analyst concluded that the shoeprints must have been made at the time of the murder. Police recorded the temperature at the scene, however, as being 93 degrees Fahrenheit.

At the direction of the crime scene analyst, police looked for persons in the crowd wearing Pro-Wing gym shoes. Police saw no one in the crowd other than defendant wearing the Pro-Wing shoe and requested that he give them his shoes for purposes of elimination, which he did. According to police, defendant's shoes were relatively clean on visual inspection. Police also inspected the church's exterior and the back stairs of the nearby Lawson home, but observed no bloody shoeprints.

Police questioned Milton Wilson at the scene. Wilson approached police officers in their cars. When questioned, Wilson produced false identification and said that Barbara Lawson, defendant's sister, had brought him to the area that morning to visit the Lawson family. Police checked Wilson's clothing and gym shoes, which appeared to be blood-free and of a different brand than the Pro-Wing gym shoe. Wilson told police that he suffered from a skin disease which caused him to scratch his arms. At some point during the continuing police investigation, Wilson submitted to fingerprinting, but police did not obtain a palm or fingertip print from him.

As part of the ongoing police investigation, defen-

dant later voluntarily gave police a statement. Following a grand jury investigation and receipt by police of results from forensic testing, defendant was indicted for T.J.'s murder.

## TRIAL

Disposition of this matter requires review of the following evidence adduced at trial. At the time of the murder, the Lawson two-story home was divided into several apartments. Old, unlighted, wooden stairs were located on the outside, towards the side rear of the home. The stairs were not readily visible from directly in front of the Lawson home. The stairs led from a first-floor area near the door to defendant's bedroom to a door on the second floor which entered a kitchen. Pam Burts' and T.J.'s bedrooms were located on the second floor of the home.

At around 5 p.m., on the evening of July 27, 1989, Pam Burts left the Lawson residence to go to her new job at the Sportsman bar in downtown East St. Louis. Neighbors saw defendant walk Burts to a waiting taxicab and saw them kiss one another goodbye.

Sometime after Burts arrived at the bar, defendant entered and observed Burts as she was being trained by her male supervisor. According to defendant's statement to police and their subsequent investigation, defendant left the bar after a few minutes, stopped briefly at a taxicab stand and then returned to the Lawson home. Defendant was witnessed at the cab stand wearing a pair of black biker shorts.

At some time before 11:30 p.m., T.J. bathed and came down to the first floor of the Lawson home to ask Alberta Lawson for a popsicle. After Lawson went into the kitchen and found that some previously prepared popsicles were not yet frozen, T.J. left the kitchen. Lawson presumed that he returned to his second-floor bedroom.

At sometime after 11 p.m., Lisa McDonald, T.J.'s sister, noticed that he was missing, and she and other children playing in and around the Lawson home began looking for him throughout the house. When the children could not find T.J. in the house, they told Alberta, who began searching with them throughout the surrounding neighborhood.

The State's evidence of defendant's whereabouts and activities on the evening of July 27 differed from defendant's evidence. The State advanced the theory that defendant was absent from the Lawson home around the time that T.J. must have left and that defendant washed his clothes and gym shoes sometime after T.J. was discovered missing. In proof of this theory, the State relied on a prior inconsistent statement given to police by John Lawson, defendant's brother.

John Lawson initially testified under direct examination that he saw defendant walking down Kansas Street towards their home prior to the time that T.J. was discovered missing, which according to Lawson was 11 p.m. After T.J. was discovered missing, Lawson next saw defendant lying on his bed at around midnight. At the point in time that he learned T.J. was missing, Lawson could not actually see defendant in his back bedroom, but defendant could have been there, based on what others had said. John maintained that it was his mother, not defendant, who washed clothes late that evening.

John Lawson's prior inconsistent statement, however, was that defendant had returned home prior to the time that T.J. was discovered missing. Defendant, at the time, appeared to mumble and was acting strange. After he arrived home, defendant changed his clothes and put them with his shoes in the washing machine.

Under cross-examination, John agreed that he did not have firsthand knowledge of defendant's clothes

washing, or of what defendant was wearing, but made the prior inconsistent statement to police based on what other persons had told him.

The State also relied on the testimony of Christopher Gossett, defendant's nephew, to prove defendant's whereabouts and activities. Gossett testified that he arrived at the Lawson home at about 10:45, close to 11 p.m. He claimed to have witnessed T.J. taking a bath upstairs at about 10:50 p.m. and learned that T.J. was missing at about 11 p.m. At the time, Gossett did not know where defendant was and had not seen him that evening. After T.J. was discovered missing, Gossett saw defendant walking down Kansas Street. Gossett testified that he saw defendant washing a pair of pants, a shirt, biker shorts and Pro-Wing gym shoes sometime after midnight while everyone was searching for T.J.

Under cross-examination, Gossett was impeached with his grand jury testimony that he did not see defendant washing any biker shorts. Gossett also contradicted his direct examination testimony as well as his grand jury testimony by insisting that defendant was at the Lawson home when Gossett arrived. Gossett's cross-examination testimony that defendant was wearing cutoff white pants that evening was further impeached with his grand jury testimony that defendant was wearing faded blue jeans. Gossett's prior inconsistent statement to Detective Muckensturm that Gossett had arrived at the Lawson home at 11:45 p.m. was also introduced as impeachment.

The State called Carlos Potts, a friend and neighbor of the Lawson family, who resided directly across the street from their home. Carlos testified that he could not remember when he went to the Lawson home, but thought that it was about 9 p.m. At the time, he was not aware that T.J. was missing. According to Carlos, defendant came home and was about to start washing his

clothes, so Carlos asked him if he would wash Carlos' shoes. Carlos thought that defendant washed pants or shorts. According to Carlos, defendant was acting unusual, as though he was afraid of something. Under cross-examination, Carlos admitted that he did not see any blood on defendant.

The State also attempted to establish that defendant was with T.J. on the evening of July 27. The State relied on a prior inconsistent statement by Markaleade Griffin, who resided near the intersection of 18th and Division Streets, an area one block away from 18th and Kansas Streets. On direct examination, Griffin testified that at about 1 a.m. or 2 a.m. on July 28, she saw, from the front upstairs window of her home, a man and a boy, who was wearing an undershirt and shorts, standing at the corner of 18th and Kansas Streets. Griffin denied previously identifying defendant as the man with the boy.

The State allowed Detective Sandra Muckensturm to read into evidence Griffin's prior inconsistent statement that she had observed defendant with the boy on the corner of 18th and Kansas Streets. Griffin's prior statement was also that, sometime after that evening, she was told by Stephanie Jones and Frances Tinon, other persons in the neighborhood, that they had observed defendant with T.J. According to Griffin's prior statement, she then realized that the boy she had observed with defendant was T.J.

Under cross-examination, Detective Muckensturm admitted that she had also taken a statement from Stephanie Jones in which Jones stated that she had observed T.J., defendant and Milton Wilson together in the alley behind the Lawson residence. Muckensturm admitted that, based on Jones' statement, she had concluded that Jones was a "liar." With reference to what Jones had supposedly told Griffin, Muckensturm

admitted that there was a possibility that that statement was also a lie. The State did not call either Jones or Frances Tinon as witnesses.

The State also relied on prior inconsistent statements of Katiesha Walker, Griffin's 15-year-old daughter, to further establish that defendant was with T.J. On direct examination, Walker did not recall telling police that she had observed a man and a child that evening. The State consequently introduced Walker's responses before the grand jury.

Walker initially testified before the grand jury that she did not see defendant and T.J. walking out of the alley north of 1817 Kansas Street and did not tell police that she did. In response to the question, "Did you ever see defendant and T.J. together that evening?" Walker replied, "Up there by the stoplights." When asked where that was, Walker responded, "On Missouri." When asked what time this occurred, Walker responded that it was about 12:01 a.m. When asked what T.J. was wearing, Walker responded, "A T-shirt and drawers." When asked what defendant was wearing, Walker responded, "Some blue jeans and a jacket." Walker responded similarly to further questioning, apparently also not understanding as simple an inquiry as whom she was with when she saw the two persons.

The State also introduced a prior inconsistent statement of Walker's made to Detective Muckensturm. In this statement, Walker said that sometime after 11 p.m., she saw defendant and T.J. walk out of the alley behind their home and head to the stoplights at 18th and Missouri Streets.

Under cross-examination, Walker testified that she had not known defendant or T.J. on July 27. Walker admitted that she had observed a man and a boy standing on the corner of 18th and Missouri Streets (about two blocks away from her home based on other

evidence), and agreed that she could not have identified the two persons from where she had stood in the front of her home. Walker also admitted that a "lot" of people had talked to her about the crime after it happened, and that other people could tell her what two persons could have been on the corner or assist her in remembering who those two were.

The State also introduced testimony that defendant was seen in the vicinity of the church that night sometime after T.J. became missing. Eva Mae Potts, Carlos' mother, testified that at about 11:30 p.m. on July 27, she saw defendant, with a shirt over his shoulders, coming from a vacant lot located between the abandoned church and the home of Alonzo Hawkins, another neighbor. Hawkins, who was in Potts' company at the time, drinking alcohol with her, asked defendant what he was doing. Defendant responded that he was bringing Hawkins' dog home. According to Potts, she and Hawkins did not see any dog. Defendant then walked in the direction of his own home.

Eva Mae Potts' testimony was impeached with her deposition testimony that she had observed defendant coming from the direction of the vacant lot and Hawkins' home at about 1:15 or 1:20 a.m., that he was wearing a shirt, and that she had entered her home and then Hawkins had asked defendant what he was doing. Under further cross-examination, Potts claimed that the deposition testimony was wrong and that the time and shirt discrepancies arose because she saw defendant for a second time that evening at 1:15 a.m. and that, unlike the first time when she saw him shirtless, he was then wearing a shirt. Potts admitted that she and Hawkins had gone to the liquor store more than once that evening to get beer for Hawkins, but stated that she had only consumed one bottle of alcoholic beverage.

Alonzo Hawkins, also called by the State, confirmed

Potts' testimony that defendant was in the vicinity of the church that night. Hawkins testified, however, that he saw defendant at around 1:20 a.m., walking from the back of the vacant lot with Hawkins' dog, which frequently wandered down to the Lawsons' home. When Hawkins asked defendant where he was coming from, defendant responded that he had been knocking at Hawkins' door and was bringing Hawkins' dog home. Defendant then continued towards his own home, and the dog was with him. During some part of the encounter, Potts was inside her home. Hawkins was able to approximate the time because he remembered that Potts' husband stated that the time was 1:22 a.m. and implied that she should stay home. Hawkins also knew that the encounter did not occur at 11 p.m. because he had been at work at that time.

The State also called Reginald Smith, an individual who lived with Alonzo Hawkins, who testified that during the early morning hours of July 28, he did not hear anyone knocking on the door of their house. Under cross-examination, Smith admitted, however, that if someone was knocking at the door, he could not have heard him due to the fact that he was taping. Smith also testified that defendant came to the house sometime after Hawkins returned from work, but he was not sure of the time, merely guessing that it was around 1 a.m. At that time, Smith spoke with defendant and did not see any blood on him.

The State introduced defendant's statement to police attempting to show how it either conflicted with other evidence or confirmed evidence which the State advanced as incriminating. Defendant's statement, read into evidence, was consistent overall with other testimony and the police investigation, except with respect to several matters.

Defendant told police that, at the time of the mur-

der, he and Burts were still dating. Defendant's statement also indicated that the last time he saw T.J. alive was shortly after Burts left for work, but before defendant left the house to ultimately go to the Sportsman bar. Defendant also interpreted his visit to the Sportsman bar slightly differently than Pam Burts. Defendant stated that he decided to go by the bar around 10:21 p.m., went by and saw that she was busy, smiled, then left to avoid making her feel uncomfortable. He also stated that he slept all night after returning from the bar and washing his clothes, except when he walked Hawkins' dog home. He did not wash his biker shorts until the next day. Also, according to his statement, defendant did not know that T.J. was missing until 5 a.m. on the morning of July 28. Defendant also stated that prior to the murder, he had been inside the church, collecting nails from boards, and that he had collected wood in back of the church the previous winter, but had not been inside the church since.

Defendant's statement also conformed to the State's evidence to some extent. He stated that at around 5 p.m., before he saw Burts off to work, he had been at a different bar, drinking gin and Stag beer. Defendant stated that he washed his underwear, other white clothes, Carlos' gym shoes and his own gym shoes sometime around 12 a.m. or 12:30 a.m. Defendant's statement also acknowledged that, at some time during the night, he walked to the nearby home of Alonzo Hawkins to return Hawkins' dog.

The State presented evidence of additional statements made by defendant. State Police senior crime scene analyst William R. Brandon testified that when he took defendant's fingerprints in January 1990, defendant asked Brandon if he thought that "they" would write a book or make a movie about him. Brandon also testified that defendant stated at the crime scene that

he had stepped inside the church's doorway, but had not gone near the body. According to police documents, defendant had stated to police at the crime scene that he had entered the church only once before to look for wood and that he had entered the church, when the body was discovered, only far enough to physically support Pam Burts.

The State also presented testimony concerning defendant's motive. Pam Burts testified that she had ended her romantic relationship with defendant, and he had been upset. A few months before T.J.'s murder, defendant told Burts that he could not stand to see her happy while he was unhappy and that she was "going to pay for it." After the relationship ended, defendant kept trying to reconcile with her.

Under cross-examination, Burts acknowledged that, prior to the murder, defendant played with all her children and never threatened them. Burts also admitted that someone other than defendant threatened to hurt her children if Lisa, her daughter, mentioned anything about being recently raped.

Ella Gossett, Christopher Gossett's mother and defendant's sister, testified that during the summer of 1989, she heard defendant say he was "going to get them," meaning Pam Burts and her children. She also testified that defendant had "jumped on" Burts several times. Under cross-examination, Gossett confirmed that Burts' daughter, Lisa, had been raped and that the alleged rapist had threatened to harm Lisa and her brothers.

Latonia Potts, Eva Mae Potts' daughter, also testified to motive. Latonia testified that defendant had threatened Burts on several occasions, but Latonia was not aware of his threatening Burts' children. Approximately a month before the murder, Latonia witnessed defendant and Burts arguing in their front yard.

Latonia further testified that, on July 29, a group of people, including defendant, Hawkins, Stephanie Jones and herself, were gathered on her mother's back porch. Some people asked defendant where he had been on the night of the murder. Stephanie Jones, Latonia's cousin, asked defendant the further question of whether he had committed the murder. According to Latonia, defendant responded that if he went to jail "he had something for [Stephanie] before he went." According to Latonia, no one else questioned defendant because they were afraid of him.

Milton Wilson, testifying for the State, said that he was a childhood friend of defendant and that he was visiting the Lawson family when T.J.'s body was discovered. Wilson explained the circumstances surrounding his presence in the church. He insisted that he had not been with defendant on the night of July 27. Wilson testified that there was then an outstanding bench warrant for his arrest concerning an incident involving his girlfriend and that he told Detective Muckensturm later that he did not want to speak originally to police because of that fact. Wilson testified that the warrant was the only reason he provided Muckensturm, on September 13, 1989, for not giving a statement earlier. The State, however, confronted Wilson with a copy of his prior statement to Muckensturm, wherein Wilson said that the reason he had not previously given a statement was that he was afraid of defendant.

Under cross-examination, Wilson admitted to smoking crack cocaine on the night of July 27. Wilson also acknowledged that even though he was "scared," he had visited the Lawson home, after not seeing defendant or his family for years.

The State presented physical evidence, including the two pieces of wooden paneling, defendant's Pro-Wing gym shoes, and the Stag beer bottle, along with exhibits

and supporting testimony by police officers, forensic technicians and a fingerprint and shoeprint expert.

Police crime scene analyst Brandon, who had received training in latent footwear impressions but was not an examiner, testified that it was only his opinion that the bloody shoeprints were made at the time of the murder. Brandon testified that he arrived at the crime scene at 12:59 p.m. on July 28 and that the blood's "drying time" was not tested because it was already dry. All of the blood he observed was concentrated in the area of the wooden panels. Brandon acknowledged that there was also a shoeprint on the wooden panels made in a white, chalky substance which appeared to be wallboard.

David Peck, a forensic scientist, testified as the State's fingerprint and footwear analysis expert. Peck testified that he identified all four latent fingerprints found on the Stag beer bottle as defendant's. Peck testified that he also positively identified a latent palmprint found on a matchbook cover as defendant's. Peck acknowledged, however, that there was no way of determining when any of the prints were made.

Peck acknowledged that he requested Detective Muckensturm to supply him with Milton Wilson's inked palm and finger tip impressions in order to compare them with certain unidentified palm and tip prints found on a matchbook and cigarette package wrapper, but that these were not provided to him. Peck also testified that he found no latent fingerprints suitable for analysis on either a spoon, a plate, or a small piece of metal tubing.

Peck further testified that he found 5 of 12 bloody shoeprint impressions on the two pieces of wooden paneling as identifiable to either defendant's right or left Pro-Wing gym shoe. Peck testified that the seven remaining shoeprint impressions could have been made by defendant's shoes. Peck also stated that the shoe-

print impression found on the page from the allegedly pornographic magazine could also have been made by defendant's shoe. Peck testified that the additional shoeprint impression, in the white, chalky substance on the wooden paneling, could not have been made by defendant's shoes.

Peck referred the jury to photographic enlargements of the shoeprint impressions, which he relied on as exhibits. Peck directed the jury's attention to a prepared chart pointing out eight different individual characteristics of the bloody shoeprint impressions on the boards. He then matched each shoeprint impression on the boards with photographic enlargements of defendant's Pro-Wing gym shoes. Peck stated that he could not determine when the bloody shoeprint impressions were made.

The defense advanced a different version of events. According to the defense, defendant was in the area of his rear bedroom, washing clothes, when T.J. became missing. Alberta Lawson, defendant's mother, testified that defendant was in his bedroom at the time that she went into the kitchen to see whether T.J.'s popsicle was frozen. According to Alberta, defendant was then lying on his bed, some of the children were playing with his socks, and he was in the process of washing his clothes. While she was not able to see defendant in his room at all times during this period, she was aware of his presence there because she could hear him. Alberta further testified that when she attempted to enlist defendant in later searching for T.J., he was fast asleep on his bed and could not be awakened.

Tonia Jones, defendant's 14-year-old niece, also testified concerning his activities and whereabouts. Jones testified that she was in the kitchen when T.J. asked for the popsicle and that she was also there, playing with defendant's socks, when she learned that

T.J. was missing. According to Jones, defendant was then in the kitchen, washing his clothes.

According to 15-year-old Antoine Tinon, a playmate of the Lawson household's children, he saw defendant in defendant's back bedroom, lying on the bed smoking a cigarette, before he and the other children discovered that T.J. was missing. Tinon could not say, however, what time he observed defendant.

Patricia Lawson, defendant's sister, testified that she was on the second floor of the Lawson home and saw T.J. bathe around 11:40 p.m. and then go into his nearby bedroom. Patricia left the home to do shopping and when she returned home, sometime between 12:30 a.m. and 2 a.m., T.J. was missing. Patricia Lawson testified that defendant was asleep and could not be awakened when the household was searching for T.J.

Frances Tinon interpreted defendant's back-porch encounter with Stephanie Jones differently than State's witness Markaleade Griffin. Tinon confirmed her prior statement to police. Defendant had said to Jones, "like [he] was kidding," that if he went to jail "with her playing Nancy Drew," he was going to "get" her. According to Tinon, defendant was only playing with Jones at the time, as he usually did.

Bennett Phillips testified, contradicting the State's evidence that defendant was with T.J. on the corner of 18th and Kansas Streets on July 27. Phillips said that on that night from about 11:15 p.m. until 2:30 or 3 a.m., he sat drinking beer with Stephanie Jones on her front porch, from which he could clearly see the particular corner. Phillips knew both defendant and T.J. and did not see either of them on the corner.

The defense also introduced a videotape, depicting the corner of 18th and Missouri Streets as viewed from directly in front of Markaleade Griffin's home at the corner of 18th and Division Streets. Patricia Lawson

testified that the street lighting shown in the videotape, shot at 9:10 p.m. on September 22, 1990, was exactly the same as that present in the area on July 28, 1989. As shown in the videotape, a person standing on the corner of 18th and Missouri would appear to be unidentifiable.

## ISSUES

Defendant raises a number of issues which need not be addressed due to the disposition of this matter. The issues we address are: (1) whether defendant was denied effective assistance of counsel due to a conflict of interest; and (2) whether the trial court abused its discretion by denying defendant funds to obtain a shoe-print and fingerprint expert witness to testify at trial and assist in the preparation of his defense. Based on our review, we answer both queries in the affirmative.

## DISCUSSION

## I

The record shows that Assistant Public Defender Walter L. Brandon, defense counsel, appeared at defendant's arraignment in this criminal proceeding on behalf of the State as the prosecuting assistant State's Attorney. Defendant contends that attorney Brandon's personal representation of both the State and himself in the same criminal proceeding constituted a conflict of interest which denied him effective assistance of counsel in violation of the Illinois and Federal Constitutions (Ill. Const. 1970, art. I, § 8; U.S. Const., amends. VI, XIV).

The State initially responds that the issue was waived. The State accurately points out that defendant did not raise the conflict of interests issue in his *pro se*, written post-trial motion, nor did a second defense counsel, who was appointed only to argue the ineffective-assistance claims included in the *pro se* motion, raise it during the post-trial hearing. The State cites to *People v. Pendleton* (1977), 52 Ill. App. 3d 241, and *People v. Wise* (1942), 379 Ill. 11, for support.

In *Pendleton*, the State argued that the defendant waived an ineffective-assistance claim based on his counsel's alleged conflict of interest. The State argued that *Wise* supported waiver where such issue is not raised in the post-trial motion of a second attorney not partaking in the alleged error. The *Pendleton* court, however, determined that the conflict of interests issue was reviewable, finding certain factual considerations to be relevant. The second attorney entered the case at a point in time when he likely would not have had direct knowledge of the alleged conflict, and he entered for a limited purpose, the scope of which was such that he would not have been required necessarily to make a detailed examination of the record. Also, nothing in the record indicated that the second attorney was, in fact, aware of the possible conflict. (See *Pendleton*, 52 Ill. App. 3d at 245.) *Pendleton* also considered *Wise* to be factually inapposite. (*Pendleton*, 52 Ill. App. 3d at 245 ("second attorney appeared after sentencing and, of necessity, would have had to review the proceedings—which should have disclosed the conduct complained of prior to filing the post-trial motion").) Defendant argues that the factual considerations in *Pendleton* are analogous to those here and, thus, demonstrate that the issue was not waived. Defendant asserts that *Wise*, as demonstrated by *Pendleton*, is inapposite.

The record shows that attorney Brandon filed a post-trial motion on October 17, 1990. Defendant filed his *pro se* post-trial motion and a motion for appointment of new counsel for post-trial proceedings on November 15, 1990. On January 31, 1991, attorney Joel Drury was appointed to represent defendant with respect to allegations of trial counsel's ineffectiveness or incompetency contained in both post-trial motions. Drury requested what he termed as the "trial transcript" on March 11, 1991. An amended *pro se* post-trial motion

was filed on May 30, 1991. At the hearing on the post-trial motions, Brandon argued his motion and those portions of the *pro se* motion which did not allege ineffectiveness. Drury's participation was limited to arguing the ineffectiveness claims in the *pro se* motion. The post-trial motions were denied on October 7, 1991. Several months later, on March 30 and 31, 1992, the arraignment transcript, showing Brandon's role as a prosecutor in the case, was certified and filed with the court.

We agree with defendant. The considerations supporting review in *Pendleton* support our consideration of the conflict issue here. Nothing in this record shows that defendant was aware of the possible conflict, requiring him to raise it in his *pro se* motion. Drury entered the case at a point in time where he likely would not have known that Brandon had also served as the prosecutor. Drury also entered for an extremely limited purpose, to argue the *pro se* ineffectiveness claims, which would not have required necessarily his review of the arraignment transcript. The arraignment transcript was also not then available. Further, there is nothing in the record which indicates that anyone, except Brandon, was aware of the possible conflict. (See *People v. Van Dyke* (1969), 106 Ill. App. 2d 411 (attorney is ordinarily not expected to include his own inadequacy in post-trial motion as ground for reversal).) It could well be argued also that it was precisely Brandon's ineffectiveness with regard to any possible conflict which discouraged it from being revealed and raised. Under such circumstances, it would be unfair to both defendant and Drury to say that Drury defaulted the issue, which was only apparent from the arraignment transcript. Consequently, we will consider the alleged ineffectiveness issue.

The right to the effective assistance of counsel is a fundamental right and entitles an accused to the

undivided loyalty of his counsel. (See *People v. Stoval* (1968), 40 Ill. 2d 109, 111.) This is a right which demands indulging " 'every reasonable presumption against ***[its] waiver.' " (*People v. Fife* (1979), 76 Ill. 2d 418, 423, quoting *Glasser v. United States* (1942), 315 U.S. 60, 70, 86 L. Ed. 680, 699, 62 S. Ct. 457, 465.) It is well established that the right prohibits the accused's attorney from representing conflicting interests or undertaking the discharge of inconsistent duties. See *People v. Spreitzer* (1988), 123 Ill. 2d 1, 13-14; *People v. Washington* (1984), 101 Ill. 2d 104, 110; *People v. Franklin* (1979), 75 Ill. 2d 173, 176; *People v. Kester* (1977), 66 Ill. 2d 162, 166; see also *People v. Gerold* (1914), 265 Ill. 448, 477 ("rule has long been firmly established that an attorney cannot represent conflicting interests or undertake to discharge inconsistent duties").

In *Stoval*, 40 Ill. 2d 109, this court adopted what is now referred to as the *per se* conflict of interests rule. (See *People v. Coslet* (1977), 67 Ill. 2d 127, 133; *Spreitzer*, 123 Ill. 2d at 14 (citing cases applying the *per se* rule).) In *Stoval*, the defendant's appointed defense counsel had personally represented the jewelry store owner complainant and the jewelry corporation in the past. Defense counsel was also a member of a law firm which then currently represented the corporation and the owner apparently with respect to other matters.

In deciding whether a conflict of interests was indicated, the *Stoval* court found persuasive the reasoning employed by Federal courts under similar circumstances. " 'This situation is too fraught with the dangers of prejudice, prejudice which the cold record might not indicate, that *the mere existence of the conflict* is sufficient to constitute a violation of relator's rights whether or not it in fact influences the attorney or the outcome of the case.' " (Emphasis added.) *Stoval*, 40 Ill. 2d at 113, quoting *United States v. Myers* (E.D. Pa. 1966), 253 F. Supp. 55, 57.

*Stoval* concluded that despite any apparent lack of diligence on the part of the defense counsel, sound policy disfavored the representation of an accused, especially where counsel was appointed, by an attorney with a "possible" conflict of interests. (*Stoval*, 40 Ill. 2d at 113.) The court indicated two considerations supported its conclusion: unfairness to the accused, who could not determine whether his representation was affected, even subliminally, by the conflict; and the additional burden placed on defense counsel, by being unnecessarily exposed to later charges of less than faithful representation. (*Cf. People v. Gerold* (1914), 265 Ill. 448, 477 ("[t]his [conflict of interests] rule is a rigid one, designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties").) The *Stoval* court held that where such a conflict exists, "there is no necessity for the defendant to show actual prejudice." *Stoval*, 40 Ill. 2d at 113.

This court has applied *Stoval's per se* rule in a number of situations. See *People v. Washington* (1984), 101 Ill. 2d 104 (defense counsel also served as part-time prosecutor for municipality whose police officers were called as State's witnesses against defendant); *People v. Fife* (1979), 76 Ill. 2d 418 (appointed defense counsel also employed part-time by State as special assistant Attorney General handling only unemployment compensation cases and defendant not informed of affiliation, nor validly waived such representation); *People v. Coslet* (1977), 67 Ill. 2d 127 (appointed defense counsel also served in related case as attorney for administrator of victim's estate); *People v. Kester* (1977), 66 Ill. 2d 162 (appointed defense counsel personally appeared several times in same case as the prosecuting assistant State's Attorney).

In each of these cases, certain facts about the defense counsel's status, by themselves, were held to engender a disabling conflict. (See *Spreitzer*, 123 Ill. 2d at 14.) The common element in these cases was that the defense counsel was previously or contemporaneously associated with either the victim (*Stoval, Coslet*), the prosecution (*Fife, Kester*), or an entity assisting the prosecution (*Washington*). See also *Spreitzer*, 123 Ill. 2d at 14 (cases show association with either prosecution or victim); *People v. Kitchen* (1994), 159 Ill. 2d 1, 29 (or association with person or entity who would benefit from defendant's prosecution).

As to such *per se* conflicts, this court has held that the defendant is not required to show prejudice or actual prejudice in order to secure a reversal of his conviction. See *Washington*, 101 Ill. 2d at 109-13 (conflict of interests resulted in reversal, even in absence of allegation that defense counsel's performance was defective); *Fife*, 76 Ill. 2d at 422 (conflict of interests resulted in reversal, even though defendant did not believe counsel was anything less than diligent); *Coslet*, 67 Ill. 2d at 135-36 (conflict resulted in reversal even though attorney's performance not before the court); *Kester*, 66 Ill. 2d at 168 (conflict of interests resulted in reversal despite absence of showing that counsel did not represent defendant in competent and dedicated manner); see also *Spreitzer*, 123 Ill. 2d at 15 (discussing *per se* conflict of interests cases).

Defendant contends that the circumstances in *Kester*, where this court applied the *per se* rule, are similar to those here. The State, relying on circumstances in *People v. Newberry* (1973), 55 Ill. 2d 74, and *Spreitzer*, 123 Ill. 2d 1, counters that a *per se* rule should not be applied in the circumstances here. Citing *People v. Allen* (1979), 73 Ill. App. 3d 471, 473, the State maintains that the *per se* rule should not be applied "blindly," but

should be applied on "the basis of reasonable and realistic factors of the particular case."

In *Kester*, the defendant was represented by an appointed defense counsel who had previously appeared in the same case as the prosecuting assistant State's Attorney. While acting as the prosecutor, the attorney made three court appearances: filing a discovery motion and motion for a bench warrant and bond forfeiture, renewing the latter motion, and presenting the defendant with a copy of the indictment. The attorney subsequently left the State's Attorney's office, became an assistant public defender, and began representing the defendant during the withdrawal of several not-guilty pleas and the acceptance of his negotiated pleas. *Kester* concluded a potential conflict was present and applied the *per se* rule, holding that it was unnecessary for the defendant to show actual prejudice.

In *Newberry*, 55 Ill. 2d 74, the appointed defense counsel had previously served as the head of the criminal division of the State's Attorney's office at the time that the defendant was indicted. The *Newberry* court declined to apply the *per se* rule, perceiving no inherent prejudice to the defendant in the particular factual setting.

In *Spreitzer*, the appointed defense counsel was an employee of the Du Page county public defender, PeterDockery. Dockery had been previously employed as an assistant State's Attorney and had been involved in the decision to charge the defendant. *Spreitzer* found that any resulting conflict of interests could only have been created because the appointed defense counsel "might have been subliminally reluctant to attack the prior decisions or behavior of someone who was now her colleague and associate." (*Spreitzer*, 123 Ill. 2d at 20.) Distinguishing *per se* cases, the *Spreitzer* court reasoned that considerations in the case more closely paralleled those inherent

to cases involving joint or multiple representation of codefendants, where the asserted conflict involved a choice between the interests of a client and the interests of a colleague. (See *People v. Banks* (1987), 121 Ill. 2d 36; *People v. Robinson* (1979), 79 Ill. 2d 147; *People v. Spicer* (1979), 79 Ill. 2d 173.) The *Spreitzer* court found that, unlike *per se* cases, the asserted conflict did not involve a direct conflict between the interests of two opposing clients or between a present client and a past personal commitment. *Spreitzer* thus declined to apply the *per se* rule of *Stoval* and its progeny and applied the case-by-case approach employed in the *Banks-Robinson-Spicer* line of cases.

In the present case, the record shows that on November 3, 1989, Attorney Brandon appeared on behalf of the State as an assistant State's Attorney at defendant's arraignment on the instant charges and a related charge of intimidation. At the hearing, Brandon filed two discovery motions and presented defense counsel with copies of the two indictments charging defendant and a warrant for his arrest. Brandon subsequently became an assistant public defender and advised the court on June 11, 1990, that he had entered his appearance as defendant's newly appointed defense counsel. Brandon thereafter represented defendant during pretrial, throughout trial, sentencing and in posttrial proceedings. There is no indication in the record that defendant was aware that Brandon had served as both the prosecutor and defense counsel in his case.

The circumstances in *Newberry* and *Spreitzer* are distinguishable from those presented here in one very salient respect: the attorneys in those cases did not personally serve in the same criminal proceeding as both the prosecutor and then as the court-appointed defense counsel. The asserted conflict in *Spreitzer* could only have developed because of the defense attorney's

subliminal reluctance to attack prior decisions or behavior of a current colleague. The asserted conflict in *Newberry* could only have developed because of the defense attorney's subliminal reluctance to attack prior decisions or behavior for which he might once have been considered indirectly accountable. By contrast, the asserted conflict here, like that in *Kester*, could have developed by defense counsel's "subliminal reluctance to attack pleadings or other actions and decisions by the prosecution which *he may have been personally* involved with or responsible for." (Emphasis added.) (*Kester*, 66 Ill. 2d at 167.) The pertinent facts of this case are more closely aligned with those in *Kester* than with those in either *Newberry* or *Spreitzer*.

In the present case, as in *Kester*, defense counsel personally appeared in court as the prosecuting assistant State's Attorney in what the State maintains were only preliminary proceedings resulting in his minimal contact with the case. The State here, as in *Kester*, argues that a possible conflict of interests should not be found to exist under such circumstances. *Kester* concluded, however, that "where counsel has repeatedly appeared on behalf of the State in the particular case in which he is now representing defendant, we are not persuaded that inquiry into the precise nature and extent of his personal involvement is either necessary or desirable." *Kester*, 66 Ill. 2d at 168.

The attorney in *Kester* performed somewhat routine functions virtually identical in nature to those performed by Brandon here, except that the activities involved three court appearances compared to the one appearance by Brandon at defendant's arraignment. Notably, however, both attorneys actually appeared only once in the accused's presence. Also, the defense counsel in *Kester* withdrew defendant's not-guilty plea and entered a negotiated plea. We do not believe that a

factual distinction between one court appearance as compared to three is sufficient to justify differing results. Nor do we believe that trying a case as opposed to negotiating it means that defense counsel could not be subject to conflict. In fact, we cannot say with any degree of certainty that an attorney in the circumstances here could not be subject to the same subtle influences, perceived in *Kester*, which might possibly affect his ability to independently and vigorously defend his client.

The contention that the performance of a court-appointed counsel in such a situation was affected by a subliminal reluctance to attack actions or decisions by the prosecution is as valid here as it was in *Kester*. Similarly, it is just the practical inability of defendant here to show to what extent this may have happened that argues for application of the *per se* rule. (*Kester*, 66 Ill. 2d at 168 ("extremely difficult for an accused to show the extent to which this may have occurred").) The factual distinctions between this case and *Kester* simply do not warrant rejecting application of *Stoval*'s *per se* rule. The rationale of *Stoval* and *Kester* is fully applicable and therefore controlling here. See also *People v. Wyatt* (1977), 47 Ill. App. 3d 582; *People v. Hall* (1978), 58 Ill. App. 3d 487.

Further, the result in *Kester* was not dictated so much by the degree of the attorney's personal involvement as a prosecutor as by the fact that he served in that capacity at all. The *Kester* court unequivocally stated: "[W]e believe that a potential conflict of interest nevertheless exists in a situation such as this when a prosecutor who personally has been involved in the prosecution of a defendant in a particular criminal proceeding later assumes the duties of court-appointed defense counsel for that defendant in the same proceeding." *Kester*, 66 Ill. 2d at 167; see also *Gerold*, 265 Ill. at 477-78

(referring to conflicts of interests rule as prohibiting an attorney, on termination of his employment, from acting as counsel against the former client in the same general matter, even though his motives and intentions are honest; and even though while acting for the former client he acquired no knowledge which could operate to the client's disadvantage in the subsequent adverse employment).

Under our Rules of Professional Conduct, the fact alone that the attorney personally represented adverse interests in the same proceeding gives rise to a conflict of interests. (See 134 Ill. 2d R. 1.9(a) (lawyer who formerly represented a client in matter shall not represent another person in the same matter, where the interests are materially adverse, unless former client consents).) A similar result should certainly obtain in criminal matters involving the death penalty, where the attorney in question is a court-appointed defense counsel who also personally represented the State.

Significantly also, this court's decision in *People v. Franklin* (1979), 75 Ill. 2d 173, 177-78, rejecting application of the *per se* rule under the facts presented there, turned on the fact that the appointed defense counsel had not been personally involved as the prosecutor in the particular case. (See *Franklin*, 75 Ill. 2d at 178 ("[i]n the case before us, defense counsel, while he was employed by the State's Attorney's office, was not involved in defendant's case").) So too, in *Coslet*, the court made clear that the *Stoval per se* rule was based on the fact of the attorney's actual commitments to others as opposed to the source of any financial gain by the attorney. See *Coslet*, 67 Ill. 2d at 133.

We note that during oral argument here, the State referred to the Illinois rule of professional conduct which pertains to the building of a so-called "Chinese wall." (See 134 Ill. 2d R. 1.10(b).) It is apparently the

State's contention that no *per se* conflict is indicated in instances where a firm represents a person in a matter that is the same matter in which a newly associated lawyer had previously represented a client with adverse interests. Under Rule 1.10(b), the firm is allowed to represent the person if the newly associated lawyer has no information protected by Rule 1.9, *inter alia,* or the newly associated lawyer is screened from any participation in the matter. See 134 Ill. 2d Rules 1.10(b)(1), (b)(2).

Rule 1.10(b), however, pertains to excepted circumstances under which *a firm or another.lawyer with the firm* may represent a client or person with interests adverse to a previous client of the newly associated lawyer. (*Cf. People v. Robinson* (1979), 79 Ill. 2d 147 (public defender's office is not to be treated as law firm for purposes of conflict of interests rule generally disqualifying all members of firm, if one attorney is disqualified).) The rule's exception does not appear to contemplate the situation where the newly associated lawyer himself actually represents the client or person with interests adverse to his previous client's. (See *Weglarz v. Bruck* (1984), 128 Ill. App. 3d 1, 4 (typically "Chinese wall" screening procedures under Rule 1.10 include prohibiting the attorney in question from any contact with the case); *SK Handtool Corp. v. Dresser Industries, Inc.* (1993), 246 Ill. App. 3d 979 (same).) Such a situation, however, is precisely the one presented here. After serving as the prosecuting assistant State's Attorney in this matter, and after being hired as a public defender, it was Brandon, not another attorney with the public defender's office, who served as defendant's defense counsel. Any considerations indicated by Rule 1.10(b) are, accordingly, not involved here.

In conclusion, we find that under the circumstances here, where defendant's court-appointed defense counsel also previously served in the same criminal proceeding

as the prosecuting assistant State's Attorney, a possible conflict of interests existed. Fairness to both the accused as well as his attorney dictates application of a *per se* rule. (See *Stoval*, 40 Ill. 2d at 113; *Kester*, 66 Ill. 2d at 167-68.) In such case, it is unnecessary for the defendant to show actual prejudice in order to be entitled to a reversal of his conviction.

Finally, it cannot be said, based on this record, that defendant was ever informed of the significance of the possible conflict here so that he might understand how it could affect, even subtlely, his representation. Under such circumstances, there was no valid waiver by defendant of his right to representation free from any conflict of interest. See *Stoval*, 40 Ill. 2d at 114; *Kester*, 66 Ill. 2d at 168-69.

Having thoroughly reviewed the evidence, we are convinced that it was sufficient to support a finding of guilt beyond a reasonable doubt. The State presented evidence that defendant's fingerprints appeared on a Stag beer bottle found at the crime scene, that shoeprints consistent with his were found in the victim's blood, and that he had a possible motive. The State's witnesses testified that he was absent from the Lawson home around the time of the victim's disappearance and later washed his clothes and shoes. Other witnesses claimed to have seen defendant with the victim after the Lawson household noticed he was missing. Still other witnesses saw defendant in the vicinity of the crime scene several hours later. Under these circumstances, defendant faces no risk of double jeopardy and may be retried. See *People v. Taylor* (1979), 76 Ill. 2d 289, 309-10.

## II

We now address an error likely to recur at trial.

Defendant contends that the trial court erred in denying his motion for funds to obtain the services of a

fingerprint and shoeprint expert. Defendant asserts that the denial of funds for such expertise denied him due process of law, effective assistance of counsel and the right to obtain witnesses for his defense.

Defendant directs attention to several bases in support of his contention: *Ake v. Oklahoma* (1985), 470 U.S. 68, 84 L. Ed. 2d 53, 105 S. Ct. 1087 (holding indigent defendants' right to fair opportunity to present a defense, partially grounded in fourteenth amendment due process, requires psychiatric evaluation and assistance at State expense where defendant's mental condition is significant factor at trial); *People v. Watson* (1966), 36 Ill. 2d 228 (holding defendant's right to summon witnesses in his behalf under section 8 of article II of the Illinois Constitution and sixth amendment of United States Constitution requires reasonable funds for expert assistance where expert opinion may have been crucial in the case and defendant's lack of funds prevented him from presenting to the jury evidence which might have established innocence); and section 113—3(d) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 113—3(d) (limited funds provided to indigent defendants for necessary expert witnesses in capital cases)).

The State acknowledges the possible constitutional and statutory dimensions of the claimed error, but asserts that defendant nevertheless failed to provide the trial court with the name of a specific expert and an estimate of the fees involved. (See *People v. Dickerson* (1992), 239 Ill. App. 3d 951, 959.) The State further asserts that defendant failed to carry his burden at the trial level as to the necessity of such an expert. According to the State, defendant could have properly defended himself by thoroughly cross-examining the State's fingerprint and shoeprint expert witness because there is nothing difficult about such forensic analysis which

would prevent a juror from determining whether it has been performed correctly and the right conclusion reached. See *State v. Corbett* (1982), 307 N.C. 169, 297 S.E.2d 553.

Finally, the State asserts that even if error, including constitutional error, occurred, the error was harmless beyond a reasonable doubt, given the convincing evidence of defendant's guilt. See *People v. Hebel* (1988), 174 Ill. App. 3d 1, 35.

In Illinois, it is well established that a denial of funds to an indigent for the securing of expert witnesses in defense of criminal charges may violate constitutional protections in certain circumstances. *People v. Watson* (1966), 36 Ill. 2d 228; *People v. Glover* (1971), 49 Ill. 2d 78, 82; see *People v. Kinion* (1983), 97 Ill. 2d 322, 334; *cf. People ex rel. Douglas v. Woods* (1968), 39 Ill. 2d 381, 384 (*Watson* rule held not to apply where proceeding not criminal and expert assistance sought was not on a crucial issue).

The *Watson* court pointed out that under both the Illinois Constitution (Ill. Const. 1970, art. II, § 8) and the United States Constitution (U.S. Const., amend. XIV), a criminally accused has the fundamental right to summon witnesses in his behalf. The *Watson* court expressed the view that such a right should not be made to depend upon the financial circumstances of the defendant. Accordingly, the court determined that reasonable funds should be made available to accuseds, in certain circumstances, in order to imbue the right with substance. *Watson*, a noncapital case, concerned a defendant's request for funds to hire a handwriting expert to give a professional opinion as to whether the defendant had signed a check which he was accused of attempting to deliver. Although the defendant was not charged with signing the check, the facts of the case were such that if he did not sign it, he did not deliver it. The *Watson* court stated

that the issue of handwriting thus went to the "heart of the defense." (*Watson*, 36 Ill. 2d at 234.) The court then found that the opinion of a handwriting expert may have been crucial to the case, and the defendant's lack of funds had prevented him from presenting evidence which might have established his innocence. *Watson* thus held that, under the facts presented, the defendant was entitled to a *reasonable* fee for purposes of hiring a handwriting expert.

Prior to *Watson*, the Illinois legislature enacted section 113—3(d), allowing courts, in capital cases, to order the payment of limited funds ($250) for necessary expert witnesses, upon a filing of a verified statement of services rendered, if the defendant was determined to be indigent. See Ill. Rev. Stat. 1989, ch. 38, par. 113—3(d); *cf. People v. Kinion* (1983), 97 Ill. 2d 322, 336 (holding that $250 statutory limit set forth in section 113—3(d) is not "rigid upper boundary," but "general caution *** that expert fees in excess of that amount are frequently not reasonably required to establish points necessary to *** defense and as a warning that any excess which is requested should be scrutinized for abuse with special care").

In analyzing the particular circumstances of each case, whether deciding statutory or constitutional issues, a standard has evolved that there must be some showing that the requested expert assistance is necessary in proving a crucial issue in the case and that the lack of funds for the expert will therefore prejudice defendant. See *Glover*, 49 Ill. 2d at 82-83; see also *Kinion*, 97 Ill. 2d at 334 (expert witness' fee recoverable only if expert's testimony necessary to prove crucial issue in case); *People v. Clankie* (1989), 180 Ill. App. 3d 726, 730 (considering *Glover* and *Watson* analysis as standard); *People v. Nichols* (1979), 70 Ill. App. 3d 748, 753 (referring to *Watson* rule as "clarified" in *Glover*).

Years after *Watson*, the United States Supreme Court in *Ake v. Oklahoma* reiterated the basic principle, partially grounded in the due process clause of the Federal Constitution's fourteenth amendment, that criminal accuseds are entitled to a fair opportunity to present a defense. (*Ake v. Oklahoma* (1985), 470 U.S. 68, 84 L. Ed. 2d 53, 105 S. Ct. 1087; see also *People v. Manion* (1977), 67 Ill. 2d 564, 576-77.) The Court stated that "a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." (*Ake v. Oklahoma*, 470 U.S. at 77, 84 L. Ed. 2d at 62, 105 S. Ct. at 1093.) The Court held that when an indigent defendant shows that his sanity at the time of an offense is to be a significant factor at trial, the State must, at a minimum, assure access to a competent psychiatrist who can examine the defendant and assist in his defense.

Because a decision in the present case, based on this court's prior interpretations of State constitutional protections (*Watson, Glover*), poses no conflict with recognized protections afforded under the Federal Constitution, we need not analyze further defendant's possible Federal claim. See *People v. Kegley* (1988), 175 Ill. App. 3d 335 (relying on *Watson* and *Glover* analysis as well as *Ake* to find violation of defendant's due process right where trial court denied request for psychiatric evaluation and assistance at State expense).

The State acknowledges the *Watson* and *Glover* rules and the relevance of section 113—3(d), but contends that an accused is additionally required to identify the specific expert he wishes to employ and give an estimate of the fees involved. (See *Dickerson*, 239 Ill. App. 3d at 959, citing *Hebel*, 174 Ill. App. 3d at 34.) The State asserts that an accused's failure to do so "warrants denial of [his] request." (See *Hebel*, 174 Ill. App. 3d at 34.) We disagree.

In *Hebel,* the court found that while the defendant had established the need for and the relevance of the expert witnesses' testimony, he had not informed the court whom he wished to employ or how much the services would cost. *Hebel* stated, "We agree with the State that greater specificity should be required before writing defendant a blank check for expert witness fees. We hold that, at a minimum, defendant must be able to identify specific experts and give the court an estimate of the fees involved." (*Hebel,* 174 Ill. App. 3d at 34.) We question that provision of this information is an absolute prerequisite to a determination that an accused is entitled to reasonable funds for obtaining expert assistance. Notably, *Hebel* cited no authority in support of this holding. The holding was also entirely unnecessary to *Hebel's* judgment affirming the denial of expert assistance funds, because the court's subsequent finding of no indigency was fully dispositive of the issue.

*Hebel* is also questionable as general authority on this issue. *Hebel* apparently misunderstood the underlying rationale and therefore the constitutional imperatives reflected in this court's *Watson* decision. *Hebel* only cited to *Watson,* the seminal case in this area, for the limited observation that a defendant can subpoena experts to testify at trial. *Hebel* relied on this observation to support its finding that the defendant did not avail himself of less expensive alternatives. The rule in *Watson,* however, is based on the recognition that even though a defendant can subpoena expert witnesses to testify at trial, the value of an expert's testimony lies not in his appearance alone, but in his more costly preparatory findings on which his later trial testimony is based. *Watson* lends little support, if any, to a finding that an accused should have subpoenaed expert witnesses rather than engage them to assist in preparing a defense as well as testify at trial. Consequently, we do

not consider *Hebel* to be persuasive authority on the issue of what demonstrates a defendant's entitlement to expert witness assistance funds.

*Dickerson*, also cited by the State, merely cites *Hebel* and notes that the trial court granted the defendant's motion for funds for expert assistance, despite that the motion was not specific as to names and costs, and *permits* the trial court on remand to require this information *if* it concludes that such action is necessary. See also *People v. Smith* (1993), 245 Ill. App. 3d 712, 717 (citing *Hebel* and considering other more important bases for denial of defendant's request for funds); *People v. Sims* (1993), 244 Ill. App. 3d 966, 982 (citing *Hebel*, but finding that defendant's indigency not proven).

More importantly, a denial of expert assistance funding to a criminal accused who has not yet identified the particular individual he wishes to hire and given an estimate of costs, but who has otherwise demonstrated his constitutional entitlement to such assistance, represents the elevation of form over substance. It would be ironic, indeed, if the right recognized in *Watson* and *Glover* was narrowed such that its entitlement depended on whether an accused was able to name the particular expert he wished to hire and the price involved.

Moreover, allowing a capital defendant's request for State-funded expert assistance without the provision of the name of the expert or an estimate of costs is not tantamount to "writing [a] defendant a blank check for expert witness fees." (*Hebel*, 174 Ill. App. 3d at 34.) In accordance with the $250 limitation on such funds in section 113—3(d) and *Kinion*'s construction of the limitation, only costs reasonably required to establish the necessary defensive points are subject to be paid by the State. (See also *Watson*, 36 Ill. 2d at 234 (limiting entitlement to a reasonable fee).) This court has, in fact, recommended a course for submitting such costs,

designed to prevent an abuse of State-funded expert assistance. (See *Kinion*, 97 Ill. 2d at 336 (construing section 113—3(d), even in a noncapital case, and finding that the best practice, where feasible, is to require appointed attorneys to petition the trial court for any amount anticipated to be in excess of the $250 limit before they spend it, and subjecting attorneys who spend any unauthorized excess amount to a substantial risk of not receiving compensation).) Having determined the necessity for funded expert assistance in any given case, trial courts are fully capable of discerning the objective reasonableness of particular requests by considering the totality of the circumstances rather than a listing of required information. Accordingly, we are unpersuaded that *Hebel*'s requirements ought to be grafted onto the present *Watson* and *Glover* analysis.

In the present case, defense counsel filed a "Motion to Provide Funds for Experts and Investigative Assistance." The motion stated that defendant was indigent, was represented by appointed counsel and could not afford to pay for experts pending reimbursement by the county. Specifically, the motion alleged that defendant would need a fingerprint expert to examine and compare shoeprints and fingerprints found at the crime scene, advise defense counsel and testify at trial. The motion stated that the services of such an expert were crucial to trial of the case because allegedly defendant's shoeprints and fingerprints were found at the scene. The motion also stated that defense counsel had no familiarity with the details of such evidence and required assistance in order to prepare a defense and cross-examine the State's expert.

At a hearing held on the motion, defense counsel argued again that defendant needed the assistance of an expert or forensic scientist in the field of fingerprints and shoeprints because he was otherwise unequipped to prepared a defense or cross-examine the State's expert.

The trial judge commented that he was inclined to somehow grant the request for funds, noting that it was a capital case with rather voluminous materials, but stated that he did not know how to limit the funding. The trial judge requested specificity concerning the area in which defense counsel needed the expertise. Defense counsel referred to the motion's specific request for a shoeprint and fingerprint expert and the reason offered for such expertise. The trial court took the motion under advisement and subsequently issued a written order stating that "the defendant's Motion for Funds for Investigative Assistance is denied."

At trial, David Peck, the State's shoeprint and fingerprint expert, testified that based on certain individual characteristics, in his opinion five of the bloody shoeprint impressions were made by defendant's shoes and the remaining seven could have been made by them. Peck also testified that he positively identified all four latent fingerprint impressions found on the Stag beer bottle as defendant's prints. However, he could not say when either the shoeprints or fingerprints had been made.

During his testimony, Peck directed the jury's attention to enlarged photographic exhibits of the bloody shoeprint impressions found on the wooden paneling and of the bottom of defendant's Pro-Wing gym shoes. Peck described in detail the manner in which he was able to identify the impressions:

> "What I've done again is put eight numbers on here and drawn them to areas which contain either one or numerous individual characteristics on the unknown bloody footwear impression on the paneling and the test impression of the bottom of this shoe. Number one is a little nick in a circular area in the ball of the shoe area.
> ***
> Again, I can point out eight different areas in—for instance, number five on the heel area I circled an area,

and they are basically two or three individual cuts or gouges within that small circular area there. What I also do when I'm comparing is *** look microscopically or very close at each of these individual characteristics to make sure that the cut or gouge, the outlying contours are the same between the unknown and the known.

***

Of course, you look closely you can see that the *** the class characteristics are also the same. You have the small linear bars in the heel area with a type of rectangular squares in both the unknown and the known.

* * *

So I was able to, by looking at the class, in other words, the type of pattern, is the same and the number of individual characteristics being the same, was able to positively say that the footwear impression—laid footwear impression on the paneling was positively made by the left shoe of People's Exhibit No. 5."

Peck then demonstrated to the jury how he matched each individual shoeprint impression found on the paneling to each of defendant's shoes. According to Peck, by taking test impressions from photographs of defendant's shoes, he was able to "line up" the impressions to find exactly which shoe made the impression and how the shoes were aligned on the paneling itself.

Peck also testified that based on wear characteristics of the two pieces of wooden paneling, he was able to align the wood as it was aligned at the murder scene. Peck additionally offered his opinion that certain of the impressions were made by the placement of the right shoe in the blood and then lifting the blood away from the surface. According to Peck, the remainder of the impressions were then made by transferring that blood from the bottom of the shoes and placing it on various parts of the board.

Under cross-examination, Peck acknowledged that, based on the totality of the prints, the shoeprints were made by someone who was not walking in a straight line of direction. He could not say that the person was

walking as if to avoid something. He also allowed that an individual's weight might affect the clarity of a print and that an impression made by an individual who limped could, but would not necessarily, be different.

At the close of the State's case, defendant renewed his motion, requesting funds to hire a shoeprint and fingerprint expert. The trial court again denied the motion.

During closing arguments, the prosecutor stated that "[t]he most important evidence in this case is the scientific evidence which was presented to you"; and "[t]he single, strongest piece of evidence in this case, and its [*sic*] a piece of evidence that you can't get around, is that piece of wood with defendant's fresh footprints in it."

Considering the record before us, there is no question that defendant's indigency was established. Applying *Watson* and *Glover* to the facts here, there can also be no question that the opinion of a shoeprint expert is necessary to proving a crucial issue in the case and that defendant was prejudiced without such assistance.

Testimony was presented that police officers investigating the crime scene believed the bloody impressions were made by someone present at the murder. Testimony was also presented that defendant walked around the body and was one of many individuals who entered the church before police arrived, some of whom might not have been scrutinized by police. The State presented its shoeprint expert's opinion that particular characteristics of five shoeprint impressions combined with their displayed brand name, "Pro-Wing," positively identified the impressions as being made by defendant's shoes. A defense shoeprint expert's opinion of the shoeprint evidence, based on finding distinguishing characteristics, could well have been that the impressions could not have been made by defendant's shoes or that they were only consistent with his shoes, or that they were made

by defendant while walking in a particular direction or pattern. Such opinion testimony could therefore prove that defendant was not the person who walked in blood near the body at the time of the murder scene, or that he walked in the blood in a manner consistent with testimony that he walked around the body after its discovery. "At the very least, an expert could have educated defense counsel as to the technicalities of the field to make cross-examination more effective." *United States v. Durant* (1976), 545 F.2d 823, 828.

The expert's opinion of the shoeprint evidence, as acknowledged by the prosecutor, was also the strongest evidence presented by the State because it was the only evidence capable of establishing defendant's actual presence at the scene at the time of the murder. The State's remaining evidence consisted of highly inconsistent eyewitness testimony and circumstantial witness testimony going only to motive and opportunity.

Defense counsel's cross-examination of the State's expert also could not constitute a sufficient defense on this issue. As defense counsel stated, he was unfamiliar with this type of evidence. Without the assistance of a shoeprint expert, defense counsel could not be sufficiently prepared to attack the scientific basis of Peck's several opinions, particularly with respect to those factors Peck relied on in positively identifying the impressions as made by defendant's shoes. Peck testified that he found at least eight individual characteristics on which he based his opinion that defendant's shoes made the bloody prints. The subtle qualities of those characteristics and indeed the actual interpretation of them, alone and combined with other factors, possibly distinguishing characteristics, were a matter of opinion and, therefore, subject to attack. Furthermore, a defense shoeprint expert could well offer his own opinions which might be entirely different from Peck's.

Moreover, the State possessed an advantage in being able to present its expert's opinion when defendant could not. (See *Little v. Armontrout* (1987), 835 F.2d 1240, 1245 (State called its own expert witness and should not have denied defendant similar weapon).) Fairness demands that defendant be allowed the means to do so.

While we reject the notion that an accused is not entitled to funds for expert assistance unless he identifies the specific expert and provides an estimate of the costs involved, we believe that defendant identified a specific expert by stating unequivocally and repeatedly that he needed a shoeprint and fingerprint expert to examine and compare fingerprints and shoeprints found at the crime scene and to assist in the preparation of a defense, as well as in the cross-examination of the State's similar expert. The trial court would not have been more assisted in deciding defendant's request for reasonable funds by the provision of a particular expert's name or his price.

We find that a shoeprint expert's opinion was necessary to defendant's proving crucial issues in this case and that the lack thereof therefore prejudiced him. Accordingly, we find that the trial court abused its discretion by denying defendant's motion for funds for expert assistance. Provided that shoeprint expert opinion evidence is used by the State in proving crucial issues, and defendant remains indigent, he must be afforded funds, upon retrial, to obtain such expertise in his own behalf.

For the reasons stated above, we reverse the judgment of the trial court and remand this cause for trial consistent with this opinion.

*Reversed and remanded.*