**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2019 IL App (3d) 170267-U

Order filed November 5, 2019

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0267 Circuit No. 10-CF-2423 |
| | ) | |
| ROBERT W. GOLD-SMITH, | ) ) | Honorable Sarah-Marie F. Jones, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE SCHMIDT delivered the judgment of the court.
Justices Carter and Holdridge concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The court did not err in denying the motion for expert fees.

¶ 2    Defendant, Robert W. Gold-Smith, appeals his conviction for aggravated domestic battery, arguing that the court erred in denying his motion for expert fees. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    In December 2010, an indictment charged defendant with aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2010)), aggravated battery (*id.* § 12-4(b)(8)), and unlawful

violation of an order of protection (*id.* § 12-30(a)(1)). Defendant received a risk assessment during which a psychologist, Dr. Nicholas O'Riordan, interviewed him. O'Riordan stated, "[Defendant] is currently exhibiting the symptoms of a major psychiatric disorder, Bipolar Disorder I. During the interview he appeared to be primarily in a manic phase, but was cycling rapidly." O'Riordan opined, "he could easily be voluntarily admitted to a hospital. [Defendant] should be reassessed by a psychiatrist. He also should have a full psychological evaluation and should have a physical examination."

¶ 5        Defense counsel filed a motion for defendant to be evaluated for sanity. Specifically, counsel "ask[ed] that Dr. Zoot be appointed." The court granted the motion. Zoot performed a psychological evaluation and report. The report stated that

> "[t]he purpose of this examination is to offer an opinion regarding [defendant's] mental state at the time of the alleged offense, specifically as to whether he suffered from a substantial disease or defect and that as a result of that disease or defect, his ability to understand the criminality of his actions was substantially impaired."

Zoot reviewed defendant's medical records and spoke to defendant. He noted that defendant had a history of bipolar mood disorder, anxiety disorder, and prescription medication abuse and dependence. Zoot opined,

> "Around the time of offense, [defendant] was experiencing significant distress secondary to marital difficulties and had symptoms including mood swings, agitation, irritability, sleep disturbance, and difficulty focusing. There is no suggestion based upon his report or the records reviewed that he was out of contact with reality. While his symptoms likely reduced his impulse control there

is nothing to suggest his ability to understand the criminality of his actions was impaired by a mental illness. Based upon my review of records and independent evaluation of [defendant], it is my opinion, within a reasonable degree of psychological certainty that at the time of the offense [defendant] *did not* suffer from a serious mental disease or defect that substantially impaired his ability to understand the criminality of his conduct." (Emphasis in original.)

¶ 6 In September 2011, defense counsel stated that there was not yet a report from their doctor, Dr. Ali. In March 2012, counsel stated to the court that it had received records from defendant's doctor and said, "After Dr. Ali gets a chance to look at them, gives us his opinion, we will be going forward." Dr. Ali evaluated defendant for defendant's motion to reinstate bail and did not find defendant to be a safety risk. In the motion, counsel stated that he believed that he had a good defense of voluntary and involuntary intoxication, which would be hard to put together while defendant was incarcerated. The State told the court that there was a pending investigation and defendant would likely be charged for soliciting men at the jail to kill his wife. The court denied the motion.

¶ 7 Defendant filed a motion for payment of expert fees. Defendant sought to obtain psychological testing from Dr. Galatzer-Levy. According to the record, Galatzer-Levy had already been paid $5000 to evaluate defendant. He determined that defendant did not fit into an involuntary intoxication defense. However, counsel stated that Galatzer-Levy "is unable to reach an opinion. He didn't reach an opinion that there is not the possibility of an insanity defense, he has no opinion based on the fact [that] he need[ed] to do further required testing." Galatzer-Levy estimated that the total cost of an evaluation would be $17,800. The State said that they could have a contracted doctor with the county evaluate defendant for sanity. Defense counsel stated,

"[The State] is referring to Dr. Zoot. Dr. Zoot made a finding that [defendant] was fit at the time or not insane at the time. [The State] used that in their case in chief. To require me to go to the witness that the State has already utilized and the State pays I don't think is what we're required to do."

The court said,

"I think it's a two-step procedure; first of all, is this crucial to the defense, and second of all, should the county pay for it. Let's assume at this time just for the sake of argument *** that this is crucial to the defense. I have no idea what property he had in the last five years, where it went to, if there's still any left, how much is on retainer, what he paid his attorneys.

I have had this issue crop up a lot lately, private attorneys who want free expert witnesses from the county. I could appoint the Public Defender and let them deal with it if he is, in fact, indigent. In the past, I have had the—one particular case I remember was a murder case where they were asking for expert witness fees and I asked for and got a list of everything that was paid to his attorney. And there was $25,000—I still remember the figure—sitting there in their trust fund waiting to be expended.

As of this date, I have never, ever, ever appointed an expert witness for the defense where the defendant was represented by private counsel. It's not that I wouldn't. It's just that there's always been money available somewhere. If they can afford an attorney, they can afford the expert witness fees. That's usually the way it ended up or that's the way it's always ended up."

The court stated that it needed a complete accounting before it could rule on the motion. The court ultimately denied the motion, stating, "If you want to have him reevaluated by Dr. Zoot and make sure that she has everything that she could possibly need to give a full and thorough evaluation, I will give you the time to do that ***." In later proceedings, defendant stated to the court,

> "If you remember, we made a request for payment of expert fees, and you denied
> that motion. He wanted an astronomical amount of money. Obviously, I didn't
> have it, and to be honest, with the amount of money he wanted, I would have
> denied it, too. It was ridiculous. I think it was $17,000."

¶ 8        Private counsel moved to withdraw, which the court allowed over defendant's objection. The record shows that before doing so, counsel had Ali evaluate the record to see if he could testify that the conduct was the result of an involuntarily drugged condition, but Ali said that the defense did not lie. Defendant was then represented by the public defender, who planned to retain Ali as a consulting witness. Defendant filed a motion alleging a conflict of interest with his attorney because defendant had filed a federal lawsuit against his counsel. In the motion, defendant made numerous allegations against counsel. Defendant waived attorney-client privilege for the hearing on the motion. Regarding the hiring of an expert, counsel stated,

> "[W]e had Doctor Ali who works in the County of Will and other counties, a
> psychiatrist.
>
> We had an agreement with him to look at the records and meet with
> [defendant] and render an opinion. My client then proceeded to write a, I could be
> off on the number of pages, I think it was around 20 pages to Doctor Ali saying

my attorney is wrong, this is what you need to do. So Doctor Ali said I'm not working with your client. I'm done. I am sending you back all the discovery.

We then attempted to hire [Galatzer-Levy], unfortunately he was cost-prohibitive."

Counsel stated that they then reached out to a psychiatrist that defendant found, but he informed them that he had been convicted of Medicare fraud. The court denied the motion.

¶ 9      After another examination by Zoot and a hearing, defendant was found fit to stand trial. The State elected to proceed first on one of defendant's other pending cases so a period of time passed before anything else happened with the current case. Defendant filed a motion for another evaluation to determine his sanity at the time of the incident. The court granted the motion. Dr. Vaca performed a sanity evaluation. Vaca stated that after speaking with defendant, defendant would not be able to obtain a finding of not guilty by reason of involuntary intoxication. Though Vaca wrote a report, defendant never sought to introduce it.

¶ 10      The evidence at trial established that on November 18, 2010, defendant and his wife, Victoria, had a court date for their divorce and an order of protection that she had filed for against defendant. Victoria and defendant were seated separately in the courtroom when defendant approached Victoria and began talking to her. Victoria walked away and went through the doors into the hallway. Defendant asked Victoria why she was "being such a mother-fucker." In the hallway, defendant pushed Victoria to the ground, pulled her hair, and punched her face approximately five or six times until someone pulled him away. Victoria had to get 14 stitches around her eye. She also had a chipped tooth and a bump on her head. A woman testified that she witnessed the event. Defendant testified that it was actually Victoria's boyfriend who punched her and defendant pulled him off of her. The jury found defendant guilty on all counts. The State

chose to dismiss the count of aggravated battery. The court merged the remaining counts and sentenced defendant to a three-year term of imprisonment.

¶ 11                                                   II. ANALYSIS

¶ 12        On appeal, defendant argues that the court erred in denying him funds to obtain an expert witness. Because defendant had access to multiple doctors, Galatzer-Levy's opinion may not have been favorable, and the fee amount was unreasonable, the court did not err in denying the motion.

¶ 13        A circuit court's denial of a motion for funds for an expert witness is generally reviewed for an abuse of discretion. *People v. Djurdjulov*, 2017 IL App (1st) 142258, ¶ 46. Every defendant has a "fundamental right to summon witnesses in his behalf." *People v. Lawson*, 163 Ill. 2d 187, 220 (1994). For indigent defendants, "reasonable funds should be made available to accuseds, in certain circumstances, in order to imbue the right with substance." *Id.* In order to receive such funds, "there must be some showing that the requested expert assistance is necessary in proving a crucial issue in the case and that the lack of funds for the expert will therefore prejudice defendant." *Id.* at 221.

¶ 14        Here, defendant cannot show that he was prejudiced by the denial of the expert fees. First, defendant had access to multiple doctors. Defendant originally asked for the appointment of Dr. Zoot to provide an examination and opinion on defendant's mental state at the time of the offense. Zoot determined that, while defendant had a history of bipolar mood disorder, anxiety disorder, and prescription medication abuse and dependence, "at the time of the offense [defendant] *did not* suffer from a serious mental disease or defect that substantially impaired his ability to understand the criminality of his conduct." (Emphasis in original.) Dr. Ali evaluated defendant for a risk assessment and was later retained to do an evaluation and be a consulting

witness on the case. He found that the defense of involuntary intoxication did not lie with defendant's case. However, he withdrew when defendant wrote him a 20-page letter complaining about his attorney. Later, defendant received another evaluation from Dr. Vaca. Defense counsel did not have Vaca submit a report to the court, presumably because it would have been unfavorable to defendant. Just because none of these doctors provided opinions favorable to defendant, does not mean that he was entitled to continue shopping for one that would at the State's expense.

¶ 15        Second, the record does not show that Galatzer-Levy would have even been helpful to defendant's case. Galatzer-Levy had already been paid $5000 to evaluate defendant. After doing so, he determined that defendant did not fit into an involuntary intoxication defense. However, Galatzer-Levy had "no opinion [on defendant's sanity at the time of the offense] based on the fact [that] he need[ed] to do further required testing."

¶ 16        Third, the court is only required to provide *reasonable* expert fees. Subsection 113-3(d) of the Code of Criminal Procedure of 1963, provides,

>        "if the court determines that the defendant is indigent the court may, upon the filing with the court of a verified statement of services rendered, order the county Treasurer of the county of trial to pay necessary expert witnesses for defendant reasonable compensation stated in the order not to exceed $250 for each defendant." 725 ILCS 5/113-3(d) (West 2012).

Our supreme court has held this $250

>        "not as a rigid upper boundary but as a general caution to trial courts that expert fees in excess of that amount are frequently not reasonably required to establish points necessary to a client's defense and as a warning that any excess which is

requested should be scrutinized for abuse with special care." *People v. Kinion*, 97 Ill. 2d 322, 336 (1983).

While the cost of experts has likely increased since 1983 when *Kinion* was decided, the sum of $17,800 is unreasonable. In fact, defendant himself stated, "He wanted an astronomical amount of money. Obviously, I didn't have it, and to be honest, with the amount of money he wanted, I would have denied [the motion for expert fees], too. It was ridiculous. I think it was $17,000." The public defender also tried to retain Galatzer-Levy after Ali backed out, but found him to be too costly.

¶ 17        We find support for our decision in the United States Supreme Court case of *Ake v. Oklahoma*, 470 U.S. 68 (1985). In *Ake*, the defendant had been charged with murdering a couple. *Id.* at 70. He was found unfit to stand trial based on his untreated paranoid schizophrenia and was committed to a state hospital. *Id.* at 71. After three months of treatment, a psychiatrist indicated that the defendant would remain stable if he continued to take his medication and was fit to stand trial. *Id.* at 71-72. While at the hospital, no inquiry had been made into the defendant's sanity at the time of the offense, and the defendant was indigent and could not afford to pay for a psychiatrist. *Id.* at 72. Defense counsel asked the court to either arrange for a psychiatrist to perform an examination or provide funds for the defendant to arrange one. *Id.* The court would not do so. *Id.* While defense counsel called the psychiatrists from the hospital to the stand during trial, none of them could testify to the defendant's mental state at the time of the incident. *Id.* The jury found the defendant guilty on all counts. *Id.* at 73. The Court held that

> "when a defendant demonstrates to the trial judge that his sanity at the time of the
> offense is to be a significant factor at trial, the State must, at a minimum, assure
> the defendant access to a competent psychiatrist who will conduct an appropriate

examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed ***." *Id.* at 83.

¶ 18        Here, defendant had access to multiple psychiatrists who conducted examinations. "[T]he obligation of the State is limited to provision of one competent psychiatrist." *Id.* at 79. This obligation was satisfied. Notably, *Ake* does not require that the State make available one psychiatrist that offers a favorable opinion to a defendant or that the State continue to provide psychiatrists until a defendant finds one that he likes. Defendant contends that the court's obligation under *Ake* was not satisfied because an expert did not also assist in preparing and presenting the defense. However, the record does not show that an expert would not have assisted. Rather, the unfavorable reports likely precluded defense counsel from using their expertise.

¶ 19        In coming to this conclusion, we reject defendant's reliance on O'Riordan's risk evaluation completed two weeks after the incident as evidence that defendant was legally insane at the time he committed the offense. O'Riordan did not consider defendant's mental state at the time of the offense.

¶ 20        Moreover, we reject defendant's contention, in the circuit court and on appeal, that Zoot was the State's psychiatrist. When asking for the appointment of Galatzer-Levy, defense counsel stated that Zoot was utilized by the State in their case. However, the record shows that defense counsel asked for the appointment of Zoot and the record does not show that Zoot was used by the State.

¶ 21                                  III. CONCLUSION

¶ 22        For the foregoing reasons, we affirm the judgment of the circuit court of Will County.

¶ 23        Affirmed.