NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 230740-U

NO. 4-23-0740

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 2, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| DITARIUS K. JORDAN, | ) | No. 20CF356 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Derek G. Asbury, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Harris and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not abuse its discretion in denying defendant's pretrial motion for the appointment of a psychological expert to evaluate his sanity at the time of the offense, because defendant failed to show that his sanity was likely to be a significant factor in his defense.

¶ 2    Defendant Ditarius K. Jordan appeals from his conviction and 65-year sentence for first degree murder (720 ILCS 5/9-1(a)(2) (West 2020)) for shooting Keishana Curry in the head at point-blank range. Defendant, who is indigent, argues that the trial court abused its discretion by denying his pretrial motion for a psychological examination at the State's expense to evaluate his sanity at the time of the offense, purportedly in contravention of the United States Supreme Court's decision in *Ake v. Oklahoma*, 470 U.S. 68 (1985). Because the court reasonably concluded that defendant had failed to "make an *ex parte* threshold showing *** that his sanity [was] likely

to be a significant factor in his defense," as required by *Ake* (*id.* at 82-83), we find no error and affirm.

¶ 3                                    I. BACKGROUND

¶ 4          Curry was found dead in the passenger seat of her car on the early morning of May 24, 2020. She had been shot in the right side of her upper lip; forensic testimony at trial indicated that the gun was less than three inches away when it was fired. Cell phone records and forensic evidence from the scene of the crime suggested that defendant was responsible. The exact nature of the relationship between defendant and Curry is unclear—her car was parked in the driveway of a residence she shared with another man—but it is clear that defendant believed Curry should not be seeing any men other than him.

¶ 5          On June 24, 2020, defendant went to the police station to make a statement, and the police interviewed him for 9 to 10 hours. After defendant provided several alternative stories that the police found unbelievable, he finally told them that he had been seated in the car with Curry and that she kept receiving phone calls from other men. According to defendant, he became frustrated and drew his gun merely to threaten her, but the gun went off by accident.

¶ 6          Defendant was charged with first degree murder (720 ILCS 5/9-1(a)(2) (West 2020)) and unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)), although the latter charge was dismissed before trial on the State's motion. Defendant was detained in the Peoria County jail pending trial. After multiple hearings at which defendant insisted that he did not want to represent himself or be represented by a public defender, the trial court appointed a public defender to represent him.

¶ 7          Throughout the proceedings below, defendant was belligerent and disruptive, arguing with the trial court and using profanity and obscene gestures. At times, he refused to come

to court, and at other times, he was removed from court or placed in leg shackles due to his disruptive behavior. While in jail, he was reported for violent and threatening behavior; he was placed in isolation from other inmates and eventually had a violent altercation with corrections officers.

¶ 8          On October 16, 2020, defense counsel moved for a psychological examination on the basis that "Defendant ha[d] exhibited behaviors which raise[d] concern regarding his mental condition at the time of the alleged offense as well [as] his fitness to stand trial." Counsel explained that "the discovery in this matter, as well as the Defendant's explanation concerning the events surrounding this case" gave counsel "a *bona fide* doubt as to the Defendant's mental status at the time of the alleged offense." Counsel sought a continuance of the trial but did not notice the motion for a hearing. However, the trial court inquired into defendant's present mental condition at another hearing in April 2021 and declined to order a psychological examination regarding his fitness to stand trial.

¶ 9          Defendant generally refused to cooperate with his appointed counsel, and his relationship with counsel became more and more contentious. In May 2021, defendant physically attacked his counsel at the jail. The trial court promptly held a hearing and gave counsel permission to withdraw. At the conclusion of the hearing, the court addressed the October 2020 motion for a psychological examination, stating:

> "With regard to that examination, I also was not persuaded that [defendant] had a basis for examination for diminished capacity on insanity at the time of the event. He has tried to make it purposely blurry and that ought not to be rewarded, so no examination has been made. And I still have no examination of him to be made."

Defendant did not renew the motion after his counsel withdrew, although in October 2022, he filed a *pro se* motion seeking an examination of his mental condition as of the time he made his confession in June 2020.

¶ 10    In November 2022, the trial court denied defendant's *pro se* motion and proceeded to a jury trial at which defendant represented himself. The jury found him guilty, and at his request, the court appointed counsel to represent him for the purpose of filing posttrial motions. In a motion for a new trial, counsel challenged the court's denial of the October 2022 motion for a psychological examination but did not mention the October 2020 motion.

¶ 11    On August 18, 2023, the trial court held a hearing on defendant's posttrial motion and discussed both the October 2020 and October 2022 motions for psychological evaluations. The court denied defendant's posttrial motion and sentenced him to 65 years in the Illinois Department of Corrections, followed by 3 years of mandatory supervised release. The court denied defendant's motion to reconsider his sentence.

¶ 12    This appeal followed.

¶ 13                                II. ANALYSIS

¶ 14    Defendant's sole argument on appeal is that the trial court erred by denying his October 2020 motion for a psychological examination to evaluate his sanity at the time of the offense.

¶ 15                            A. Legal Standard

¶ 16    We note at the outset that defendant's fitness to stand trial is not at issue in this appeal. "A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2020). Mental fitness to stand trial is also referred to as "competency to

stand trial" (*Dusky v. United States*, 362 U.S. 402, 402 (1960) (*per curiam*)) or "present sanity" (*Pate v. Robinson*, 383 U.S. 375, 384 (1966)). Because an incompetent defendant is effectively unable to defend himself at trial, the United States Supreme Court "ha[s] repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.' " *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (quoting *Medina v. California*, 505 U.S. 437, 453 (1992)).

¶ 17            Insanity at the time of the offense is different. Although the insanity defense has ancient roots, no particular formulation of the insanity defense is required by the due process clause of the fourteenth amendment (U.S. Const., amend. XIV, § 1). See *Kahler v. Kansas*, 589 U.S. 271, 296 (2020) ("Defining the precise relationship between criminal culpability and mental illness" "is a project for state governance, not constitutional law."). All formulations revolve around the principle that a defendant whose act would otherwise be criminal is excused of criminal responsibility because he was insane when he committed that act. *Id.* at 283 ("[F]or hundreds of years jurists and judges have recognized insanity (however defined) as relieving responsibility for a crime."); see *Clark v. Arizona*, 548 U.S. 735, 749-52 (2006) (cataloguing various approaches to the insanity defense). Because the inquiries into mental fitness and insanity are different and apply to different timeframes, a finding that the defendant is fit to stand trial does not preclude a finding that he was insane at the time of the offense, and vice versa. See, *e.g.*, *Pate*, 383 U.S. at 384 (addressing the possible incompetency of a defendant found sane at the time of the offense); *Ake*, 470 U.S. at 86 (addressing the possible insanity of a defendant found competent to stand trial).

¶ 18            In Illinois, a defendant whose conduct would otherwise subject him to a finding of guilt may instead be found "not guilty by reason of insanity" if he can prove by clear and convincing evidence that "at the time of [his] conduct, as a result of mental disease or mental

defect, he lack[ed] substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2020); see *id.* § 6-2(b) ("The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."). To meet this evidentiary burden at trial, the defendant will obviously need evidence that he suffered from a mental disease or mental defect at the time of his conduct. The United States Supreme Court has held that

> "when [an indigent] defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake*, 470 U.S. at 83.

¶ 19      The State acknowledges this standard in its brief but argues that defendant was instead required to "show that the requested expert assistance [was] necessary in proving a crucial issue in the case and that the lack of funds for the expert [would] therefore prejudice him." *People v. Taylor*, 2022 IL App (3d) 190281, ¶ 17 (*Taylor I*), *aff'd*, 2023 IL 128316 (*Taylor II*), *cert. denied*, 144 S. Ct. 246 (2023). However, the case *Taylor I* cited for this proposition involved a defendant who wanted "to obtain the services of a fingerprint and shoeprint expert" rather than a psychological expert as in *Ake*. *People v. Lawson*, 163 Ill. 2d 187, 218-19 (1994). Although the supreme court in *Lawson* did mention *Ake* in passing, the court based its decision not on *Ake* or the United States Constitution but on prior Illinois Supreme Court decisions applying the Illinois Constitution. See *id.* at 222. On its face, *Lawson* appears to demand more than *Ake*, which allows for the appointment of a psychiatrist "to help determine whether the insanity defense is viable." *Ake*, 470 U.S. at 82. If a defendant requesting funds to obtain the services of a psychiatrist under

*Ake* cannot be required to demonstrate that the insanity defense is even *viable*, then it does not seem he could ever be required to demonstrate that the psychiatrist's services were necessary to prove insanity at trial under *Lawson*.

¶ 20　　　　In any event, we need not decide whether the State's preferred standard is in fact more demanding than *Ake* because we may follow the supreme court's lead in *Taylor II* and consider *Ake* alone. See *Taylor II*, 2023 IL 128316, ¶ 41 (affirming *Taylor I* when "the basis for the appellate court's ruling was its analysis of the requirements set forth in *Ake*"); *cf. Lawson*, 163 Ill. 2d at 222 (declining to extend *Ake* when well-established Illinois caselaw provided a sufficient basis for deciding the case). Under both standards, we review the trial court's decision for an abuse of discretion. *Taylor II*, 2023 IL 128316, ¶ 27 (citing *Lawson*, 163 Ill. 2d at 230).

¶ 21　　　　　　　　　　　　　B. Forfeiture of the Issue

¶ 22　　　　The State argues that defendant forfeited this issue for appeal on the sole basis that the trial court never held a hearing or formally ruled on the October 2020 motion. See *People v. Redd*, 173 Ill. 2d 1, 35 (1996) ("A movant has the responsibility to obtain a ruling from the court on his motion to avoid [forfeiture] on appeal."). However, the court specifically addressed the motion at the hearing where it allowed defense counsel to withdraw, stating that it would not order an examination because it was unpersuaded by the motion; it said nothing to indicate that it was reserving its decision until after it held a hearing. See *Selby v. Danville Pepsi-Cola Bottling Co.*, 169 Ill. App. 3d 427, 439 (1988) ("When a trial court reserves a ruling, the party seeking the ruling must seek a decision in order to preserve the matter for review.").

¶ 23　　　　Despite the State's argument to the contrary, we find that this constituted a ruling on the merits of defendant's motion sufficient to avoid forfeiture of the issue on appeal. See *Adams v. Bath & Body Works, Inc.*, 358 Ill. App. 3d 387, 399 (2005) (noting that the trial court's ruling

- 7 -

on a motion must address its substantive merits). As for defendant's failure to simply make an identical motion after counsel withdrew, we do not encourage, much less require, a defendant to badger the court for a formal ruling on a renewed motion when the court has literally spoken to the motion's lack of merit. *Cf. People ex rel. Klaeren v. Lisle*, 202 Ill. 2d 164, 178 (2002) ("[T]here is no need to object when it is apparent that an objection would be futile.").

¶ 24                                   C. Procedural Requirements

¶ 25        *Ake* does not mandate the appointment of a psychiatrist whenever the defendant asks for one; *Ake* specifically requires the defendant "to make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense." *Ake*, 470 U.S. at 82-83. The State argues that the defendant must make this showing by formally notifying the State that he intends to pursue the affirmative defense of insanity pursuant to section 115-6 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-6 (West 2020)) and Illinois Supreme Court Rule 413(d) (eff. July 1, 1982). This argument immediately falters in the face of *Ake*'s holding that the necessary threshold showing can be made on an *ex parte* basis, *i.e.*, without involving the State. Furthermore, a *per se* requirement that the defendant must express an intent to pursue the insanity defense in the absence of psychiatric evidence to support that defense would present two major difficulties.

¶ 26        First, it might put defense counsel to an ethical dilemma: (1) assert the insanity defense in the absence of concrete facts that the defendant suffers from a mental disease or mental defect even if counsel strongly suspects that a psychiatrist would reach that conclusion or (2) decline to assert a potentially meritorious insanity defense. See Ill. R. Prof'l Conduct (2010) R. 3.1 (eff. Jan. 1, 2010) ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous."). Indeed,

the appointment of a psychiatrist is partly intended "to help determine whether the insanity defense is viable." *Ake*, 470 U.S. at 82. The State's proposed approach would put the cart before the horse by requiring defense counsel to conclude that the insanity defense is viable without first receiving input from a psychiatrist. See *Schultz v. Page*, 313 F.3d 1010, 1017 (7th Cir. 2002) ("[W]e find it difficult to understand how [the defendant] could have formally asserted an insanity defense before the appointment of a psychiatrist.").

¶ 27 Second, a defendant's notice to the State that he intends to pursue an insanity defense triggers the State's own statutory right to an examination by a psychologist or psychiatrist of its choice. 725 ILCS 5/115-6 (West 2020). Similarly, Rule 413(d) is intended to enable the State to respond to the defendant's evidence of insanity at trial by requiring him to disclose that evidence well in advance. See Ill. S. Ct. R. 413(d), Committee Comments (adopted Oct. 1, 1971) ("Such discovery eliminates unfair surprise and allows the opposing party to establish the truth or falsity of the defense."). However, the trial court would presumably still have the discretion to conclude that the defendant had not made the showing required by *Ake*, leaving the psychiatric evidence solely in the hands of the State's expert if the defendant nevertheless attempted to pursue the insanity defense at trial. Even if the court did order an examination pursuant to *Ake*, the appointed psychiatrist might conclude that the defendant had no mental disease or defect, requiring the defendant to withdraw his intent to pursue the insanity defense despite having supplied the State with a psychological examination and discovery it would not have otherwise received.

¶ 28 Accordingly, we decline to hold that noncompliance with either section 115-6 of the Code or Rule 413(d) categorically bars a defendant from seeking the appointment of a psychiatric expert under *Ake*.

¶ 29 D. Application of *Ake*

¶ 30 Our inquiry now turns to whether the trial court's denial of the motion constituted an abuse of discretion. "Generally, a court abuses its discretion when its decision is fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." *People v. Ortega*, 209 Ill. 2d 354, 359 (2004). As noted above, defendant was required to show that "his sanity [was] likely to be a significant factor in his defense" (*Ake*, 470 U.S. at 82-83) or, in other words, that his sanity was "seriously in question" (*id.* at 70). We share the State's concern about the perfunctory nature of defendant's two-page motion for a psychiatric examination on both insanity and fitness, but under *Ake*, the trial court was obligated to consider not just the motion itself but all the facts before it at the time, including matters that were also pertinent to defendant's fitness. See *id.* at 86 ("On the record before us, it is clear that [the defendant's] mental state at the time of the offense was a substantial factor in his defense, and that the trial court was on notice of that fact when the request for a court-appointed psychiatrist was made."). After reviewing this record, we find the trial court's conclusion that defendant failed to make the required showing was reasonable on two separate grounds.

¶ 31 First, defendant needed to raise a serious question that "he lack[ed] substantial capacity to appreciate the criminality of his conduct" at the time of the offense. 720 ILCS 5/6-2(a) (West 2020). This long-established approach to the insanity defense is known as the moral incapacity test (*Clark*, 548 U.S. at 751) and applies when the defendant's insanity "obliterat[es] the sense of right and wrong as to the particular act done," *Hopps v. People*, 31 Ill. 385, 392 (1863). The moral incapacity test is difficult to satisfy, even for a defendant with an extremely distorted perception of reality; for instance, someone with paranoid schizophrenia may appreciate that it is wrong to kill someone even if he believes that the victim is not really a person but an inhuman witch or alien. See, *e.g.*, *Commonwealth v. Bruno*, 466 Pa. 245, 253 (1976) (upholding a

determination that the defendant understood the wrongfulness of his conduct when he hid the gun he had used to shoot someone he believed to be a "black witch"); *Clark*, 548 U.S. at 745 (similar, the victim was believed to be an alien impersonating a police officer).

¶ 32 In the present case, defendant's conduct—drawing a loaded gun on a trapped and defenseless woman and shooting her in the face at point-blank range—does not fall in a moral gray area. Defendant points to nothing in the record showing that his sense of right and wrong was ever distorted, much less so distorted that he failed to appreciate the wrongfulness of this clearly abhorrent conduct. Indeed, defendant's brief fails to address the moral incapacity test altogether; he refers only to the fact that he has "trust issues" and saw a counselor from the age of 4 to 11 or 12. It is far from obvious how this bears on defendant's sense of right and wrong at age 28 when he shot the victim, but in any event, a reasonable person could agree with the trial court's finding that these facts did not place defendant's sanity seriously in question under the moral incapacity test.

¶ 33 In arguing for a contrary result, defendant relies principally on *People v. Kegley*, 175 Ill. App. 3d 335, 340 (1988), but his reliance is misplaced. When *Kegley* was decided in 1988, a defendant could prove his insanity by showing that "he lacked substantial capacity *** to conform [his] conduct to the requirements of law." *People v. Moore*, 147 Ill. App. 3d 881, 885 (1986) (citing Ill. Rev. Stat. 1983, ch. 38, ¶ 6-2(a)). This approach to the insanity defense is known as the volitional incapacity test (*Clark*, 548 U.S. at 749) and has since been abolished in Illinois. *People v. Ramsey*, 192 Ill. 2d 154, 157 (2000). Moreover, *Kegley* is easily distinguishable on its facts, as shown by an addendum to the motion for a psychiatric examination that the trial court denied in that case:

"The addendum asserted that three days prior, [defense counsel] learned that defendant had been hospitalized at the Elgin State Mental Hospital pursuant to court order sometime in 1973; that defendant had been treated several times at the Alcohol Treatment Center in Waukegan; that he had been treated at the Lake County Mental Health Center on two occasions between 1981-84; and that he had been hospitalized at St. Therese Hospital's psychiatric ward on a number of occasions between 1972-74. The addendum further asserted that at the time of his arrest, defendant acted erratically in that he had requested to be shot by arresting officers and threw himself against the bars and walls of his cell and that he also had a history of arrests involving abnormal behavior." *Kegley*, 175 Ill. App. 3d at 338.

The addendum to the motion in *Kegley* is much more complete than the conclusory and largely fact-free motion filed in this case. In addition, in *Kegley*, we found that the denial of the motion "was clearly an abuse of the trial court's discretion" (*id.* at 343), *i.e.*, no reasonable person would have doubted that the defendant's sanity at the time of the offense was seriously in question. Although we cannot precisely delineate when a threshold showing under *Ake* is sufficient to find an abuse of discretion on appeal (see *Ake*, 470 U.S. at 86 (conducting a case-specific factual analysis)), we have no trouble concluding that the trial court acted within its discretion in finding that defendant here failed to satisfy that standard.

¶ 34     Second, assuming for the sake of argument that defendant had shown "he lack[ed] substantial capacity to appreciate the criminality of his conduct" (720 ILCS 5/6-2(a) (West 2020)), he nevertheless failed to show that his moral incapacity manifested in some way other than "by repeated criminal or otherwise antisocial conduct" (*id.* § 6-2(b)). Absent this showing, defendant's sanity could not have been a significant factor in his defense, so the trial court did not abuse its

discretion in denying defendant's motion for a psychological examination. See *People v. Foster*, 43 Ill. App. 3d 490, 495-96 (1976) ("[W]hen the evidence only shows an abnormality manifested by repeated criminal or otherwise anti-social conduct," "the evidence would not be sufficient to raise the affirmative defense of insanity." (Emphasis omitted.)); *cf. People v. Wilson*, 191 Ill. 2d 363, 382 (2000) (finding no abuse of discretion when the trial court refused to order further testing into the cause of the defendant's mental problems when that information was not necessary to ascertain the effect of the defendant's mental problems on the issue before the court).

¶ 35　　　　　Finally, defendant appears to argue that the threshold showing required by *Ake* should be lower if the State's evidence of guilt is strong. While it is true that *Ake* was concerned with ensuring an indigent defendant could fairly respond to the State's charges in the adversarial process of a trial, that concern was motivated not by a desire to facilitate the defense of insanity *per se* but by a desire to ensure the finder of fact is presented with accurate information when an indigent defendant's sanity is genuinely at issue. See *Ake*, 470 U.S. at 82. *Ake* was not intended to provide indigent defendants with a license to confuse the issues at trial simply because it might make the State's otherwise straightforward case more difficult to prove.

¶ 36　　　　　　　　　　　　III. CONCLUSION

¶ 37　　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 38　　　　　Affirmed.